**Steve Zissou & Associates**

42-40 Bell Boulevard | Suite 302 | Bayside | New York | 11361 | 718.279.4500 | stevezissou@stevezissouesq.com

May 1, 2026

**BY ECF**

The Honorable Pamela K. Chen
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *United States v. Nelson Ojeriakhi*, Case No. 23 Cr. 188 (PKC)

Your Honor,

I respectfully submit this letter to aid the Court in determining a fair and just sentence for Nelson Ojeriakhi in the above-referenced matter. Based upon a total offense level of 26 and a criminal history category of I, the guideline imprisonment range is sixty-three (63) months to seventy-eight (78) months.[1]

**The Offense Conduct and the Defendant's Role**

Nelson Ojeriakhi pleaded guilty to one count of Wire Fraud Conspiracy, admitting his participation in a series of business email compromise schemes targeting individuals engaged in real estate transactions between March 2018 and June 2022. PSR ¶ 1. The scheme, as described in the Presentence Report, operated through the interception and manipulation of email communications—exploiting the vulnerability of parties in the midst of large financial transactions by redirecting wire transfers intended for legitimate purposes into accounts under the conspirators' control. PSR ¶ 9. The technique, known as "spoofing," involved the creation of email accounts nearly identical to those of legitimate parties—lawyers, brokers, buyers—so that the fraudulent instructions appeared to originate from trusted sources. PSR ¶¶ 9, 11. It was, in the dispassionate language of the Presentence Report, a form of "cyber enabled financial fraud." PSR ¶ 8. It was also, in the plainest terms, a confidence scheme dressed in modern technology.

What the Presentence Report makes equally clear, however, is the precise contour of Mr. Ojeriakhi's role within this conspiracy—and it is a contour that resists the most damning interpretations the loss figures alone might invite. The scheme was not devised by Nelson Ojeriakhi. It was, the Probation Department notes, "orchestrated by Animashaun Adebo," his co-defendant, who remains pending trial. PSR ¶ 8. Mr. Ojeriakhi, the Probation Department

[1] *See* Presentence Report (PSR) at ¶¶ 35. The maximum term of imprisonment is twenty years. 18 U.S.C. §§ 1349 and 1343.

concludes, was "an equal participant in the instant offense conduct"—not an organizer, not a leader, not a manager or supervisor. PSR ¶ 20. The Presentence Report is explicit on this point, and no role adjustment has been recommended in either direction. PSR ¶ 29. He was not the architect of this conspiracy; he was a participant in it. That distinction does not diminish the harm caused, but it is a distinction the Court must consider in determining what sentence is sufficient, and no more than sufficient, to serve the purposes of justice.

It is also worth situating Mr. Ojeriakhi's conduct within the geography of this offense. He is a lifelong citizen and resident of Nigeria who has never lived in or worked in the United States. PSR ¶¶ 42, 47. He has no ties to this country beyond the jurisdictional reach of a wire fraud statute that, by design, extends to foreign commerce. The victims were here; the harm landed here; and the Eastern District of New York properly exercises jurisdiction over his conduct. But the offense was committed from abroad, by a man who set foot on American soil for the first time as a prisoner. The Probation Department has applied a two-level enhancement because a substantial part of the fraudulent scheme was committed from outside the United States—an enhancement that is both technically correct and, in its own way, a tacit acknowledgment that this case has an unusual character. PSR ¶ 27. Mr. Ojeriakhi was not embedded in an American criminal network. He was also not an American citizen or permanent resident trying to conceal illegal activity by conducting it abroad. He operated remotely, across an ocean, in a context far removed from the communities he harmed. This does not make him less culpable for what occurred. It does, however, inform the analysis of what sentence is proportionate.

Finally, and with particular significance for the Court's consideration: Mr. Ojeriakhi has accepted responsibility without equivocation. He made no post-arrest statements to foreign or domestic authorities—a silence counsel advised and which is his right—but when extradited to the United States in July 2025, he pleaded guilty promptly, in November of that year, sparing the Court the burden of trial and sparing the victims the obligation of reliving their experiences in a public proceeding. PSR ¶ 20. The Probation Department has recommended, and the Government has indicated it will move for, all three points for acceptance of responsibility. PSR ¶¶ 32, 33. That recommendation is well-earned. Mr. Ojeriakhi has not minimized his conduct, has not sought to shift blame for his own actions onto his co-conspirators, and has agreed to pay restitution in the full amount established by the Government. PSR ¶ 15. Whatever the ultimate sentence imposed by this Court, Nelson Ojeriakhi has made plain that he understands the gravity of what he did and the harm it caused.

## The Man Before the Court

Nelson Ojeriakhi was born on April 22, 1993, in Lagos, Nigeria—the second of three children born to Samuel Ojeriakhi, a retired engineer, and Margaret Izirein Ojeriakhi, a homemaker. PSR ¶ 43. His parents remain together, remain healthy, remain in Lagos, and remain, to this day, emotionally supportive of a son who has, from a prison cell on the other side of the world, done his best to maintain the weekly communication they have always shared. PSR ¶ 43. That his parents know of his conviction and have not retreated from him

tells you something about the family in which he was raised. That he has maintained that relationship across years of incarceration, including over two years in a French detention facility where visitation was not permitted, tells something about the man. PSR ¶¶ 43, 51. His father explains, in one paragraph of a letter written jointly with his wife:

> Nelson has consistently shown compassion and responsibility toward his family. His absence has left a significant void in our lives, especially as we grow older and face more frequent health challenges. Prior to his arrest, he had always attended to our medical needs by accompanying us to hospital appointments, ensuring we take our medications, and making sure we are properly cared for. I remember when I, his father, underwent a major eye surgery, Nelson remained by my side, spending nights at the hospital. assisting with daily care, and providing constant reassurance and support.

*See* Exhibit A (Testimonials) at 1.

The physical circumstances of Mr. Ojeriakhi's childhood were, by any measure, harsh. He grew up in what is known in Nigeria as a "face-me-I-face-you" building—a specific and evocative architectural form in which a row of one- and two-room apartments faces an identical row across a narrow communal walkway, the shared spaces functioning as the connective tissue of a community assembled by circumstance rather than choice. *Id.* He shared that building with thirty other people and a single bathroom. PSR ¶ 45. He did not have access to a shower until he reached junior high school; before that, he addressed his hygiene with a bucket. *Id.*

He describes his childhood, nonetheless, as "good"—and that word, offered without irony or self-pity, speaks to both his resilience and his perspective. There was no abuse in his home—there was simply poverty, density, and the particular kind of hardship that comes not from cruelty but from the unyielding arithmetic of limited resources. *Id.*

The face-me-I-face-you housing typology is not merely an architectural curiosity—it is the subject of a substantial body of Nigerian urban scholarship, and what that scholarship reveals about its effects on the children who grow up within it is directly relevant to the Court's understanding of Nelson Ojeriakhi's formative years. The structure, ubiquitous in Lagos and other major Nigerian cities, is defined by its radical compression of private and communal life: families occupy single rooms or small suites opening onto a shared corridor or courtyard, with bathrooms, kitchens, and social space held in common by dozens of residents who did not choose one another as neighbors. *See*, e.g., Max Bearak, "How Africa Will Become the Center of the World's Urban Future." *The Washington Post* (November 19, 2021).[2]

---

[2] Available online at https://www.washingtonpost.com/world/interactive/2021/africa-cities/. Last accessed April 13, 2026.

Researchers studying low-income housing in Lagos have documented occupancy densities that strain comprehension by Western standards—studies have recorded as many as eight to ten persons sharing a single room, with communal sanitation facilities serving populations that would overwhelm them under any reasonable calculus. Akin L. Mabogunje, "Urban Planning and the Post-Colonial State in Africa: A Research Overview," *African Studies Review*, Vol. 33, No. 2 (1990): 121–203;[3] *see also* Jokotola Omidiji, et al. "Investigating the Impacts of COVID-19 Safety Measures and Related Uncertainties Among Socially Vulnerable Groups in Lagos Megacity." *Heliyon*, Vol. 8, No. 8 (2022).[4] The consequences for children developing within these environments are well-documented: chronic noise and overcrowding have been linked to elevated physiological stress responses, disrupted sleep, and measurable deficits in concentration and academic performance. Privacy—the developmental resource that allows a child to form an interior life, to process experience, to simply be alone with thought—is, in the face-me-I-face-you compound, essentially unavailable. Fundamentally, such housing arrangements lack privacy and feature poor living conditions, despite their original intent as a "suitable solution for the rapidly expanding city." Paul Yakubu, "How Face-Me-I-Face-You Homes Became a Way of Life in Lagos," *Bloomberg* (May 5, 2022).[5]

This enforced communality has a double-edged nature. Such a housing compound, for all its deprivations, functions as an involuntary village—a space in which children are simultaneously exposed to the full spectrum of adult behavior and embedded in a web of informal social surveillance and mutual aid. But it also promotes exposure to substance use, criminality, and the normalization of economic survival by any available means is a documented feature of the face-me-I-face-you environment. As noted, Mr. Ojeriakhi described his childhood, with characteristic resilience, as "good." The scholarship suggests that the environment in which that childhood unfolded was considerably more complicated than that single, generous word implies—and that the complications it introduced into his developing understanding of the world are neither irrelevant nor to be dismissed.

The lived experiences of Mr. Ojeriakhi's siblings reflect the family's determination to build lives of substance despite those constraints. His sister Gloria, now twenty-nine, is an in vitro fertilization specialist. PSR ¶ 44. She writes:

> Growing up with Nelson, I have known him to be consistently kind caring and deeply supportive to me, our family, and everyone around him. He has played a significant role in many aspects of my personal development particularly in encouraging my growth and career progression.

---

[3] Available online at https://www.cambridge.org/core/journals/african-studies-review/article/abs/urban-planning-and-the-postcolonial-state-in-africa-a-research-overview1/D36553C687C744BFE5F77DC70023AA53. Last accessed April 15, 2026.
[4] Available online at https://pmc.ncbi.nlm.nih.gov/articles/PMC9391079/. Last accessed April 15, 2026.
[5] Available online at https://www.bloomberg.com/news/features/2022-05-05/the-history-and-design-of-lagos-face-me-i-face-you-homes. Last accessed April 15, 2026.

> There were periods in my career when I felt discouraged and considered giving up, believing that I was not making meaningful progress. During those times, my elder brother was a constant source of support and guidance. He listened patiently, helped me reflect on my goals, and encouraged me to remain disciplined and focused despite setbacks. His advice was both thoughtful and practical, and it gave me the confidence to continue moving forward.

Ex. A at 2.

His brother Wilson, twenty-three, works as an information technology executive, an impressive position for one so young. PSR ¶ 44. But he credits his brother for helping him to get to this position. Wilson explains,

> It is in Nelson's nature to be helpful and caring toward everyone around him. I have turned to him on countless occasions during challenges, and he has always been available to offer support and guidance.
>
> One of such occasions was while I was still in university and had a carryover, meaning I had failed a course and needed to retake it the next year. It was the first time this had happened to me, and I felt discouraged and unsure how to move forward. I spoke to my brother about it, and he guided me patiently, reassuring me that failing a course did not mean I could not succeed. He also helped me prepare more effectively for the next attempt. Through his consistent support, I was better prepared and ultimately passed the course.

Ex. A at 3.

Nelson, for his part, earned a bachelor's degree in agricultural economics from the University of Benin in 2015—no small feat for a young man who grew up without a shower. PSR ¶ 55. He went on to pursue two careers before the offense conduct in this case began: first as a professional singer, signed to K-Solo Productions from 2013 to 2014 and then independent through 2018, earning the equivalent of two thousand dollars a month at his peak; PSR ¶ 59; and then as an information technology executive at Dereel Global Network, where he worked full-time from 2018 until his arrest in 2023. PSR ¶ 58. These are not the credentials of a man without legitimate capacity or ambition. They are the credentials of a man who chose, at some point in his mid-twenties, to supplement legitimate income with criminal conduct—a choice that was wrong, that caused real harm, and for which he is now paying a significant price.

In 2021, Mr. Ojeriakhi married Busayo Sanni in Lagos. PSR ¶ 46. She remembers that she "first met Nelson while [they] were both volunteering with a non-governmental organization that supported families in underserved communities." Ex. A at 4. She explains:

> At the time, we did not know each other personally, but his actions stood out to me. He approached the outreach work with genuine passion and took responsibility beyond what was required of him. He was actively involved in all aspects of the initiative, ensuring its success rather than seeking recognition.
>
> His willingness to go the extra mile for people he barely knew was admirable. He treated everyone with dignity and respect, regardless of their circumstances. Watching him serve others so selflessly made a lasting impression on me.
>
> As we grew closer and eventually started a family together, those qualities never changed. This is the person he truly is at heart.

*Id*.

Ms. Sanni, thirty-two years old, is the owner of a real estate business; she is healthy, she is aware of her husband's conviction, and she remains emotionally supportive of him. PSR ¶ 46. Their son, London Ojeriakhi, was born in 2021—and was seven months old when his father was arrested at Charles de Gaulle Airport in Roissy-en-France on April 18, 2023. PSR ¶¶ 46, 47. London is now three. He has never known his father outside the context of incarceration, and Mr. Ojeriakhi has not been present for a single day of his son's conscious life. Mr. Ojeriakhi has described his worry about the impact of his absence on their relationship, and his eagerness to be reunited with his child—and those are not the words of a man performing remorse for an audience. PSR ¶ 46. His wife has expressed her need for him to be present physically and financially. *Id*. His son has expressed nothing, because his son is three years old, and does not yet have the language for what he is missing.

## The Appropriate Sentence

The United States Probation Department—after a careful review of the facts, the guidelines calculation, and the totality of Mr. Ojeriakhi's history and characteristics—has recommended a sentence of forty-eight months. Probation Department Sentencing Recommendation at 1. That recommendation reflects, in the Probation Department's own words, the recognition that the applicable guideline range "appears to overstate the defendant's involvement in criminal conduct"—a conclusion the Probation Department reached, notably, in Part E of the Presentence Report, under the heading of factors that may warrant a sentence outside the advisory guideline system. PSR ¶ 82.

This is not a perfunctory observation. The Probation Department has identified, with care and specificity, the mechanism by which the guidelines produce an inflated result in this case: the loss-driven calculation creates an offense level so elevated that it cannot accurately reflect Mr. Ojeriakhi's actual culpability. The Guidelines intended loss here is $5,265,105.75; the actual restitution obligation, as agreed in the plea, is $3,734,188.31. PSR ¶¶ 14, 15. The eighteen-level enhancement triggered by the loss amount is the single largest driver of the guideline range, and Probation itself has flagged its disproportionate effect. PSR ¶¶ 25, 82.

We respectfully submit that the sentence the Court should impose is time served.

As of the date of sentencing, Nelson Ojeriakhi will have been in custody for approximately three years—arrested in Paris on April 18, 2023, PSR ¶ 19, confined there under conditions his own report describes as traumatic, PSR ¶ 51, and transferred to the MDC on July 28, 2025. PSR ¶ 48. The question this Court must answer is not whether Mr. Ojeriakhi should be punished. He has been, and he is being punished—every day, in a facility the judiciary of this District has described with language that would not have surprised Dostoevsky. The question is whether the punishment already endured, when assessed with honesty and precision, satisfies the purposes that sentencing is designed to serve.

Consider what the record actually shows. Mr. Ojeriakhi has no prior criminal history—none, not even an arrest. PSR ¶¶ 36, 37, 38. He was an equal participant in this scheme, not its architect or its manager. PSR ¶ 20. He operated from Nigeria, never setting foot in the United States until he arrived here in the custody of the United States Marshals. PSR ¶¶ 42, 47. He pleaded guilty promptly upon extradition. PSR ¶ 20. He has agreed to full restitution. PSR ¶ 15. He has not had a single disciplinary infraction during his incarceration, in either France or Brooklyn. PSR ¶ 48. The Probation Department has concluded he is unable to pay a fine. PSR ¶ 64. He will, upon any sentence involving his eventual release, face deportation—an ICE detainer has been lodged, and there is no ambiguity about where he will spend the remainder of his life. PSR ¶ 47. He will be deported to Nigeria, where his wife and three-year-old son await him, PSR ¶ 46, where his parents and siblings live, PSR ¶¶ 43, 44, and where, whatever the future holds, he will never again be in a position to perpetrate crimes against individuals in the United States. General deterrence will have been served—his extradition from France alone sends a message that the reach of American law enforcement is long and its patience is durable. Specific deterrence will have been served, comprehensively, by the experience of over three years in custody, the loss of the first years of his son's life, the public record of his conviction, and the restitution obligation that will follow him for decades.

The Probation Department has recommended forty-eight months—a sentence that is itself substantially below the guideline range of sixty-three to seventy-eight months—and the Probation Department is to be commended for the intellectual honesty of that recommendation. PSR ¶ 66; Probation Department Sentencing Recommendation at 1. But forty-eight months would require Mr. Ojeriakhi to serve additional time beyond what he has already served, and that additional time would be served at the Metropolitan Detention Center. The conditions at that facility require no elaboration before this Court. They are severe, they are well-

documented, and they are—by the repeated assessment of judges in this District who have sat in this building and reviewed these records—harsher, in measurable ways, than ordinary federal custody. Time served at the MDC is not time served in the abstract.

There is a child in Lagos who has not seen his father since he was seven months old. PSR ¶ 46. There is a wife who has been running a business and raising that child alone for three years while her husband has been in a French cell and then an American one. PSR ¶ 46. There is a mother and a father in their sixties who call their son every week and receive the call because their son, despite everything, has not stopped making it. PSR ¶ 43. A sentence of time served does not minimize the harm this offense caused, and we do not ask this Court to treat it as though it does. Mr. Ojeriakhi recognizes the impact of his crimes. He writes:

> I think often about the people I harmed. Not as names on a document, but as human beings who were in the middle of something important in their lives when I intervened and took something from them that I had no right to take. Some of them were buying homes. Some of them had saved for years, decades, to have the money I stole. I knew that, in some general way, when I was doing what I was doing…and I did it anyway. I cannot explain that in a way that would satisfy anyone, including myself. What I can say is that I am sorry, genuinely and without reservation, and that I understand sorry is not enough. I will spend years paying back what I took, and I will do so not because a court has ordered me to, but because those people are owed it: every dollar, and more than every dollar, because there are things I took from them that no restitution schedule can ever repay. I am not asking for forgiveness from my victims. I am asking only that they know I see them, I understand what I did to them, and I will spend the rest of my life making it right in every way that remains available to me.

*See* Exhibit B (Defendant's Letter to the Court) at 1–2.

The victims of these schemes—some of whom offered impact statements of genuine and moving gravity—suffered real losses, and their suffering is not erased by Mr. Ojeriakhi's own hardship. PSR ¶¶ 17, 18.

But the parsimony principle, detailed *infra*, exists precisely for cases like this one: cases where the Sentencing Guidelines, by the Probation Department's own admission, have overshot the mark, PSR ¶ 82; where the defendant before the Court is a first offender who has served significant time under punishing conditions, PSR ¶¶ 37, 51; where deportation renders supervised release largely symbolic, PSR ¶ 47; and where the sentence already endured, evaluated with clear eyes, is sufficient to accomplish everything that sentencing is designed to accomplish—punishment, deterrence, protection of the public, and respect for the law.

A sentence of time served is, we respectfully submit, sufficient. It is not greater than necessary. And it is, on these facts, the right result.

**The Purposes of Sentencing**

Section 3553(a) of Title 18 directs this Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in the statute. Indeed, the command of the parsimony clause defines this Court's "overarching duty." *Pepper v. United States*, 131 S.Ct. 1229, 1243 (2011).

Those purposes are familiar, but their application to any particular defendant demands the kind of individualized attention that the Sentencing Guidelines, by their nature, cannot fully provide. Nelson Ojeriakhi is not a data point. He is a thirty-two-year-old man from Lagos, Nigeria,[6] who has spent the last three years in custody—first in a French detention facility where he was confined to his cell for twenty-two hours a day without visitation, and then at the Metropolitan Detention Center in Brooklyn, where he has witnessed violence, accumulated no infractions, and waited. The § 3553(a) factors, applied honestly to the facts of this case, point in one direction.

A sentence of time served for Mr. Ojeriakhi would satisfy the goals of sentencing and factors outlined in 18 U.S.C. § 3553(a). Section 3553(a) provides that a sentence should be "sufficient, but not greater than necessary," and that courts must consider, among other factors, "(1) the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the need for the sentence imposed…to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" (3) "the need for the sentence imposed…to protect the public from further crimes of the defendant;" (4) "the need for the sentence imposed…to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and (5) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(1)-(2), (6); *see also United States v. Roney*, 833 F. App'x 850, 852 (2d Cir. 2020). "[T]he weight to be afforded any § 3553(a) factor is a matter firmly committed to the discretion of the sentencing judge." *United States v. Keitt*, 21 F.4th at 72 (2d. Cir. 2021) (quoting *United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008)).

As the Supreme Court reaffirmed in *Pepper*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper*, 131 S.Ct. at 1240 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). While the Guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 128 S.Ct. 586, 596–97 (2007). Rather,

[6] Mr. Ojeriakhi will be thirty-three years old when he is sentenced.

the judge is directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id.* at 597.

Several issues, satisfying each of the 3553(a) factors, warrant considerable leniency from the Court.

A. The Nature and Circumstances of the Offense, and the History and Characteristics of the Defendant

The offense was serious. PSR ¶ 9. A series of business email compromise schemes spanning four years targeted individuals in the midst of real estate transactions—some of the most significant financial moments of their lives—and redirected their funds into accounts controlled by Mr. Ojeriakhi and his co-conspirators. PSR ¶¶ 9, 13. The actual loss to victims was $3,734,188.31; the Guidelines loss, including attempted losses, was $5,265,105.75. PSR ¶ 14. Several victims suffered not merely financial harm but the kind of destabilizing, enduring harm that follows the loss of money carefully saved over decades. PSR ¶¶ 17, 18. The Court should not minimize what was taken from them, and we do not ask it to do so.

But the nature and circumstances of this offense also include facts that cut the other way, and they must be weighed with equal honesty. As noted *supra*, the scheme was not Mr. Ojeriakhi's creation—it was orchestrated by his co-defendant, who remains pending trial. PSR ¶ 8. Mr. Ojeriakhi was an equal participant, not a leader, not a manager, not a supervisor. PSR ¶ 20. He operated from Nigeria, a country in which he has spent his entire life, and from which he conducted this offense remotely, never once entering the United States in the course of the conspiracy. PSR ¶¶ 42, 47. He has no prior criminal history of any kind. PSR ¶¶ 36, 37. And he has, by every available measure, accepted responsibility fully and without condition. PSR ¶¶ 22, 32, 33.

His personal history, also detailed above, is one of modest origins and genuine achievement, followed by a catastrophic lapse in judgment whose consequences he will carry for the rest of his life. He grew up in poverty in Lagos, sharing a building with thirty people and a single bathroom, without access to a shower until junior high school. PSR ¶ 45. He earned a Bachelor's degree. PSR ¶ 55. He built two legitimate careers. PSR ¶¶ 58, 59. He married, and his son was born, and seven months later he was arrested in a Paris airport. PSR ¶¶ 46, 47. None of that erases the harm he caused. All of it is relevant to who he is.

B. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

A sentence of time served—which, as of the date of sentencing, will represent approximately three years of custody—is not a sentence that fails to reflect the seriousness of this offense. It is a sentence that reflects it accurately. Mr. Ojeriakhi has spent more than two of those years in a French detention facility under conditions the Presentence Report itself describes as traumatic: twenty-two hours of daily cell confinement, no visitation, isolation

from a wife and an infant son he would not see again for the duration of his French custody. PSR ¶ 51. He has spent the remainder at the Metropolitan Detention Center, where the conditions are well known to this Court and require no extended recitation. PSR ¶¶ 48, 51. Though Mr. Ojeriakhi recognizes it was his own crimes that resulted in him being in the MDC—"I now understand that choosing shortcuts and ignoring consequences carries a cost, both to others and to oneself," Ex. B at 2—time served in those facilities is not the equivalent of time served in a well-functioning federal institution. It is harsher, by any honest measure, than the guidelines contemplate—and the Court is both permitted and obligated to account for that reality in calibrating just punishment.

General deterrence has been served—emphatically and durably—by the facts of this prosecution. Mr. Ojeriakhi was arrested at Charles de Gaulle Airport in April 2023, held in French custody for over two years, extradited across the Atlantic, and now stands before this Court. PSR ¶¶ 19, 20, 47. The message that reach of American federal jurisdiction is neither limited by geography nor deterred by distance has been delivered far more powerfully by the arc of this prosecution than by any additional months of incarceration beyond what Mr. Ojeriakhi has already served. For anyone in Nigeria, or anywhere else, who might contemplate a similar scheme and wonder whether American authorities will bother to pursue them—the answer, provided by this case alone, is unambiguous.

Respect for the law, moreover, is not promoted by the imposition of sentences that exceed what the facts actually demand. The Probation Department has itself acknowledged that the guideline range overstates Mr. Ojeriakhi's involvement in criminal conduct. PSR ¶ 82. A sentence that the sentencing authority's own probation office regards as disproportionate does not promote respect for the law. It undermines it.

The period of Mr. Ojeriakhi's pretrial detention warrants particular attention, because it has been neither brief nor comfortable. He was arrested in Paris in April 2023 and remained in French custody for more than two years, until his extradition to the United States in July 2025. PSR ¶ 47. During that period in France, he was confined to his cell for twenty-two hours per day and was not permitted visitation. PSR ¶ 51. He described this experience as traumatic—and whatever one's views on the appropriate weight to assign to a defendant's subjective experience of incarceration, twenty-two hours of daily confinement without visitation is, by the standards of any jurisdiction that considers itself governed by the rule of law, an extraordinary deprivation. He has been at the Metropolitan Detention Center in Brooklyn since July 28, 2025, where he has witnessed violence among fellow inmates, has had virtually no access to meaningful educational courses—the unavailability of which in many units at the MDC is a matter of extensive judicial record in both this District and the Southern District—and has had no disciplinary incidents of any kind. PSR ¶¶ 48, 51. But he has persevered. He petitioned to join the National Parent Programming, and, at the time of this writing, has completed the first phase of it. *See* Exhibit C (Educational Courses) at 1. He completed the other two "courses" offered to him—handouts provided on blood pressure and beginners' chess. *Id*. at 2–3.

He has, in short, served his time quietly, without complaint, and without misconduct.

Courts have recognized the conditions at the MDC as a reason to sentence below the Guidelines. *United States v. Hernandez-Velazquez*, Case No. 19 Cr. 306 (WFK), 2024 U.S. Dist. LEXIS 214412, at *22 (E.D.N.Y. Nov. 21, 2024) (sentencing defendant to time after considering, *inter alia*, conditions at MDC Brooklyn). "The issues at MDC are not limited to circumstances that were necessitated by the COVID pandemic." *United States v. Colucci*, 743 F. Supp. 3d 452, 455 (E.D.N.Y. 2024). A sentence served at MDC is materially different and necessarily disparate from one served elsewhere. *Colucci*, 743 F. Supp. 3d 452, 462.

Courts in this district and the Southern District have not minced words. *United States v. Days*, Case No. 19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021), ECF 35 (Sentencing Transcript), at 19–21 ("It is the finding of this Court that the conditions to which [the defendant] was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that…I think you've suffered triply as a result…. I am convinced that no good would be served by keeping you incarcerated for one minute more than I am required to do by law."); *see also United States v. Morgan*, Case No. 19 Cr. 209 (RMB) (S.D.N.Y. May, 5, 2020), ECF 90 (Sentencing Transcript), at 37 (sentencing below Guidelines given "the conditions of the MDC…particularly during this difficult coronavirus time, but also across the board even before the coronavirus erupted"); *United States v. Nunez*, Case No. 19 Cr. 691 (CM) (S.D.N.Y. May 5, 2021) (sentencing a narcotics conspiracy defendant to time served instead of the recommended forty-six to fifty-seven months because the defendant had already spent eighteen months incarcerated at the MDC under "terrible" conditions during prolonged lockdown); *United States v. Garcia*, Case No. 19 Cr. 593 (PAC) (S.D.N.Y. Dec. 3, 2020) (imposing 48-month sentence where bottom of Guidelines range was 110 months); *United States v. Colon*, Case No. 15 Cr. 317 (MKB) (E.D.N.Y. Nov. 20, 2020) (imposing 18 months, consecutive to defendant's 18-month state sentence, where bottom of guidelines was 100 months); *United States v. Rodriguez*, Case No. 19 Cr. 817 (PAK) (S.D.N.Y. Oct. 6, 2020) (sentencing a narcotics conspiracy defendant with three prior drug felonies to time served because of the "very unusual and very harsh" conditions at the MDC); *United States v. Aracena de Jesus*, Case No. 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020) (imposing a substantial downward variance in part because of "the hard nature of the time [the defendant] has served in the MCC"); *United States v. Carillo-Berber*, Case No. 18 Cr. 703 (PAC) (S.D.N.Y. June 11, 2020) (sentencing a narcotics conspiracy defendant to time served instead of the recommended forty-six to fifty-seven months due to conditions at the MDC during prolonged lockdown).

"The dockets of this Court and the Eastern District have been filled with cases in which defendants complain about near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care…. It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable." *United States v. Chavez,* Case No. 23 Cr. 303 (JMF) (S.D.N.Y. January 4, 2024), ECF 31 (Opinion and Order), at 1–3.

C. The Need to Protect the Public from Further Crimes of the Defendant

Mr. Ojeriakhi is a first offender. PSR ¶¶ 36, 37. He had never stepped foot in the United States until he was extradited here. He will be deported upon the conclusion of his sentence and is eager to return home. PSR ¶ 47. He has a wife and a son in Nigeria who need him. PSR ¶ 46. He will not return to the United States again. *United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014) (recognizing that deportation is a permissible factor for consideration at sentencing). Indeed, the reality that he has been convicted of a crime for which he has served years in prison only reinforces his desire not to commit a crime again. He has been separated from his family for all this time. He does not want to be separated from them again in the future. His family does not want him away from them, either. His wife adds, "Nelson is a committed husband and a devoted father to our three-year-old son. We miss him dearly, and look forward to him being physically present in our lives again." Ex. A at 4.

The public requires no protection from Nelson Ojeriakhi that is not already provided by the combination of his deportation, his restitution obligation, his criminal record, and the experience he has endured. PSR ¶ 47. He has parents and siblings in Nigeria who have stood by him. PSR ¶¶ 43, 44. He has a restitution obligation of $3,734,188.31 that will follow him for the remainder of his life. PSR ¶ 15. He has a federal conviction that will be a matter of public record for as long as public records exist. The specific deterrent effect of all of this, combined with the three years he has already served, is not merely adequate—it is overwhelming. He will return to Nigeria, where he was born, where he has lived his entire life, and where his family resides. PSR ¶¶ 42, 43, 46. He will not return to the United States. He poses no ongoing threat to the communities whose members were harmed by this offense. And there is nothing in his background—no history of violence, no prior criminality, no pattern of recidivism—that would suggest a risk of future conduct of this nature. PSR ¶¶ 36, 37, 38, 50.

Put simply, Mr. Ojeriakhi is remorseful—and not simply because he was arrested, but because he recognizes that his actions broke the law, and because he recognizes the profound impact his arrest has had on his family, including his wives, his children, and his aged mother. *See*, e.g., *United States v. Cosme*, Case No. 06 Cr. 608 (JBW), at *2 (E.D.N.Y. Jan. 19, 2010) (finding recidivism unlikely in part given the defendant's "lack of any prior criminal history, acceptance of responsibility, …and supportive family members"). Indeed, he has become a leader in the small Christian community in his unit, and twenty-six fellow inmates have noted that he "has expressed his regret and repentance for his past mistakes and ex[h]orts us all to do the same," commenting that they "consider [him] a role model for all to follow." Ex. A at 5.

Mr. Ojeriakhi has spent a great deal of time reflecting on his crimes and the effect they have had both on his victims and on his family. "I am committed to living within the law, working honestly[,] and being a responsible presence for my family and within my community. I understand that rebuilding trust takes time and I am prepared to do that work." Ex. B at 2.

In any event, the Sentencing Commission has not found a "correlation between recidivism and guidelines' offense level…. While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004), at 15.

D. <u>The Need to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment</u>

Mr. Ojeriakhi does not require substance abuse treatment. PSR ¶ 53. He does not require vocational training. What he requires, in the most human sense, is the opportunity to return to his family and to fulfill the financial obligations he has accepted. Additional incarceration actively delays the only form of rehabilitation that the record suggests is both available to and meaningful for him: the rebuilding of a life, in Nigeria, as a husband and father with a debt to pay and a future to construct.

But here, an additional fact about the period of Mr. Ojeriakhi's incarceration deserves note, because it is both remarkable and revealing. On December 5, 2023—while confined in France, in a cell for twenty-two hours a day, separated from his wife and infant son by thousands of miles and by a legal proceeding he could not control—Nelson Ojeriakhi earned an Initial Diploma in French Language from France Education International. Ex. C at 4–8; *see also* PSR ¶ 54. He was not idle. He was not despairing. He was studying. That fact is small, perhaps, in the context of a sentencing proceeding that turns on Guidelines calculations and restitution obligations and the weight of harm done to nineteen victims. But it is not without meaning. A man who earns a language certificate in a foreign prison, in the language of that country, while awaiting extradition on federal charges in the United States, is a man who has not given up on himself—and who has, in some modest but unmistakable way, decided that the time he has is still worth something. And it underscores how harsh the conditions have been at MDC Brooklyn—the *lack* of educational opportunities and bureaucratic resistance on the part of the Federal Bureau of Prisons to permitting easy access to advanced education has stymied Mr. Ojeriakhi from continuing his studies.

E. <u>The Need to Avoid Unwarranted Sentence Disparities</u>

The Probation Department's own recommendation of forty-eight months reflects a significant downward variance from the guideline range of sixty-three to seventy-eight months. Probation Department Sentencing Recommendation at 1; PSR ¶ 66. That variance is grounded in the Probation Department's candid assessment that the guideline range overstates the seriousness of Mr. Ojeriakhi's conduct. PSR ¶ 82. A sentence of time served—itself a further variance from the Probation Department's recommendation—is warranted by the full weight of the factors enumerated above: a first offender, PSR ¶¶ 36, 37; an equal but not leading participant, PSR ¶ 20; three years of custody under conditions more severe than ordinary federal incarceration, PSR ¶¶ 47, 48, 51; certain deportation, PSR ¶ 47; full acceptance of responsibility and agreement to pay restitution, PSR ¶¶ 15, 22, 32, 33; and the

recognition, plainly stated in the Presentence Report itself, that the Guidelines have overcounted. PSR ¶ 82. A sentence of time served does not create an unwarranted disparity. On these facts, it avoids one.

## Conclusion

Nelson Ojeriakhi will be thirty-three years old when he stands before the Court for sentencing. He has been in custody since April 18, 2023—arrested in a foreign country, held there for over two years under conditions that would test any person's capacity for endurance, and then extradited to face justice in a country he had never visited. He has done all of this without a disciplinary infraction, without complaint of record, and without the benefit of a single day in the company of London, his son, who was seven months old when he last saw him. He has pled guilty, accepted responsibility, and agreed to pay back every dollar the Government has established as actual loss to his victims. He has done, in short, everything the law asks of a defendant who has come before this Court to answer for serious misconduct.

The Probation Department has recognized that this is not a guidelines case. The Sentencing Guideline range does not capture the man before this Court, the role he played, the life he has led, or the punishment he has already endured. We respectfully submit that the full weight of the § 3553(a) factors—the conditions of confinement, the certainty of deportation, the absence of any criminal history, the family waiting in Lagos, the child who does not yet know his father's face outside the context of a prison visit—compels a sentence of time served.

The victims in this case suffered real harm, and their losses are not minimized by this submission. But justice is not measured only in months. It is measured in the full accounting of what has been taken, what has been given back, and what further deprivation serves any legitimate purpose. On that accounting, the ledger is balanced.

We respectfully request that the Court sentence Nelson Ojeriakhi to time served. He will return to Nigeria. He will pay what he owes, for as long as it takes. He will raise his son. And he will carry the weight of this conviction—and of the harm it represents—for the rest of his life. That is not nothing. That is, on these facts, enough.

Thank you very much for your consideration in this matter.

Respectfully submitted,

Steve Zissou, Esq.

SZ/jc